# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | Bankruptcy Case No. 15 B 04436 |
| ) | |
| DAVID E. LENOCI, II, ) | Chapter 7 |
| ) | |
| Debtor. ) | Honorable Janet S. Baer |
| ) | |
| CHRISTOPHER SALGADO, ) | Adversary Proceeding No. 16 A 00223 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DAVID E. LENOCI, II, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This matter is before the Court for ruling on the amended complaint filed by plaintiff Christopher Salgado against debtor-defendant David E. Lenoci, II, seeking a determination that a state court judgment debt is not dischargeable under 11 U.S.C. § 523(a)(6).[1] For the reasons below, the Court finds that the debt is for a willful and malicious injury and is, thus, not dischargeable under the statutory exception. As such, judgment will be entered in favor of Salgado and against Lenoci.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

---

[1] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532.

## BACKGROUND

The pertinent facts are gleaned from the Court's docket, the pleadings and attached exhibits, and the testimony given and evidence admitted at a bench trial held on March 21, 2018. At that trial, Salgado, his brother, and Lenoci testified about a fight that took place on December 11, 2001 and the events that followed. Having weighed the credibility of the witnesses and reviewed the trial transcript and evidence, the Court summarizes the relevant facts as follows.

### A. The Fight

It is undisputed that Salgado lost the vision in his right eye as a result of being struck in the face during the fight. (Joint Pretrial Statement at 2.) The parties' main disagreement is about who caused the injury. (*Id.*) Salgado and his brother testified that Lenoci struck Salgado in the face with a baseball bat. (Tr. at 73:1-21, 124:13-17.[2]) In contrast, Lenoci testified that his friend Joseph Lopez hit Salgado with a bicycle kickstand. (Tr. at 31:7-8.) In addition to disputing who struck Salgado, the parties told different stories about other events surrounding the fight.

### 1. Salgado's Version of the Story[3]

On the day of the fight, Salgado, his brother, and their roommate learned from a friend that Lenoci had threatened to damage their cars. (Tr. at 70:4-5, 83:13-85:2, 121:10-15.) To "defuse the situation," Salgado and others drove to Lenoci's house to "try to smooth things out." (Tr. at 70:11-15.) After they got out of the car and approached the house, Lenoci and Lopez came out of the house bearing weapons—Lenoci a bat and Lopez an object that looked like a pipe. (Tr. at 72:4-25.) Seeing the weapons, Salgado became concerned for his safety and retreated to the street. (Tr. at 73:1-8.) Lenoci pursued him, and "words were exchanged." (Tr. at 73:7-18.)

---

[2] All references to "Tr. at __:__" are to the transcript of the trial that took place on March 21, 2018.

[3] The trial testimony summarized in this section is Salgado's and his brother's and should not be construed as findings of fact.

At the same time, a car pulled up and stopped in front of Lenoci's house. (Tr. at 93:1-94:8, 124:8-17.) As Salgado turned to look at the car, Lenoci struck him in the face with the bat. (*Id.*) Salgado fell to the ground, where Lenoci and his friends repeatedly kicked him and hit him with weapons. (Tr. at 73:22-74:14, 124:5-17.) At some point, Salgado managed to get up and run away to the backyard of a nearby home. (Tr. at 74:21-75:24.) The homeowner called an ambulance, which arrived and took Salgado to the hospital. (Tr. at 76:4-14.) He remained there for three days. (*Id.*)

Salgado suffered injuries to the face, knee, ankle, shoulder, and forearm. (Tr. at 105:20-24.) While in the hospital, doctors told Salgado that he would lose his right eye and need a glass replacement. (Tr. at 77:6-9.) Doctors performed several surgeries to repair damage to the retina and optic nerve. (Tr. at 77:15-78:7.) Ultimately, although Salgado did not lose his eye, he lost the vision in it. (Tr. at 77:9-11.)

Shortly after the fight, Salgado moved in with his parents so that they could care for him while he was on crutches, unable to work, and taking pain medication. (Tr. at 78:21-25.) Since the injury, Salgado has had to go to the eye doctor more often than before, and, more than ten years after the fight, he had to undergo surgery to correct drifting in the injured eye. (Tr. at 78:7-14, 81:6-8.) Salgado's medical expenses for the injury totaled tens of thousands of dollars.[4]

### 2. Lenoci's Version of the Story[5]

Lenoci testified that he and some friends were "just hanging out" at his house on the day of the fight.[6] (Tr. at 26:1-4.) At some point, a girl stopped by and spoke with one of Lenoci's

---

[4] At the trial, Salgado estimated that the expenses totaled "over $30,000 [or] $40,000." (Tr. at 81:20-23.)

[5] The trial testimony summarized in this section is Lenoci's and should not be construed as findings of fact.

[6] Asked whether Lopez was there, Lenoci testified, "Yeah, he was—see, I'm not sure if he was there with us or if he pulled up in the car afterwards. I'm not exactly sure." (Tr. at 28:17-20.)

friends. (Tr. at 26:5-16.) After the girl left, Lenoci learned that the two had actually argued and that she had told his friend that some people were coming to "beat up" Lenoci and his friends. (*Id.*) Salgado arrived at Lenoci's house twenty or thirty minutes later. (Tr. at 26:24-27:1.)

Salgado and Lenoci met in front of the house. (Tr. at 27:15-20.) Salgado and others then threatened Lenoci and his friends; in response, Lenoci told them to leave. (*Id.*) They initially refused but eventually turned around and went back toward the car in which they had arrived. (Tr. at 14:1-7, 28:24-29:5.) At that time, another car pulled up in front of the house, and more of Lenoci's friends got out.[7] (Tr. at 29:9-24.) The fight started soon thereafter, and Lopez struck Salgado in the face with a bicycle kickstand. (Tr. at 31:6-19.) There were several witnesses, including Lenoci's mother, who saw Lopez strike Salgado, but "they all refused" to subsequently testify on Lenoci's behalf. (Tr. at 51:5-52:16.)

### B. The Criminal Case

About two months after the fight, the police arrested Lenoci and took him to the station for questioning. (Tr. at 32:9-33:24.) When officers asked him who else was present during the fight, Lenoci refused to provide them with any names. (Tr. at 35:3-16.) Lenoci testified that the police then gave him an ultimatum: "[I]f [he] didn't confess to a misdemeanor, they would upgrade it to a felony and . . . [he] wouldn't be getting out of jail." (Tr. at 35:23-36:1.) Lenoci eventually accepted the "deal" and signed some sort of statement.[8] (Tr. at 36:10-37:2.) The police officers also met with Salgado, and he told them his version of the story. (Tr. at 78:19-79:10.)

The State of Illinois subsequently filed a criminal complaint against Lenoci for

---

[7] Asked who was in the car, Lenoci said, "I think Joseph Lopez got out of that car[.]" (Tr. at 29:20-23.)

[8] Lenoci testified that, after signing the statement, he called someone to pick him up from the police station and to pay the small bond required for a misdemeanor. (Tr. at 36:23-37:4.) Lenoci further testified that if he had been charged with a felony, "[he] would have [had] to go to a bond hearing the next morning[,] [a]nd [the police] said that the bond would be so high that [he] wouldn't be able to afford it." (Tr. at 37:5-10.) Lenoci claimed that he would have had to "just stay in jail until [he] served [his] time . . . ." (Tr. at 37:11-12.)

misdemeanor battery.[9] (Pl. Trial Ex. 1.) The complaint, signed by Salgado, alleged that Lenoci "knowingly caused bodily harm to [Salgado], in that he struck [Salgado] in the face with a baseball bat." (*Id.*) Lenoci testified that, at the first court appearance, the judge offered him the choice of serving nine months in jail or coming back to court with an attorney. (Tr. at 37:18-21.) He chose to find an attorney. (*Id.*) According to Lenoci, his attorney said that pleading innocent and fighting the charges would cost at least $5,000 but pleading guilty would keep him out of jail and cost only $1,000. (Tr. at 38:3-13.)

Lenoci could not afford to fight the charges, and his main goal was to avoid jail time, so his decision was simple—plead guilty and, in doing so, stay out of jail. (Tr. at 38:14-24.) Although he confirmed that "[none] of the words on [the] paper matter[ed] to [him]" after he decided to plead guilty, Lenoci acknowledged that he read and signed the following statement: "I understand the nature of the charge against me. It is my desire to voluntarily plead guilty to the charge of battery." (Tr. at 39:9-11; Pl. Trial Ex. 3.) The criminal court sentenced Lenoci to fifty days of an alternative work program. (Tr. at 39:12-15.)

### C. The Civil Case

Once the criminal case concluded, Salgado filed a civil complaint against both Lenoci and Lopez.[10] (Tr. at 79:21-22, 101:4-10; Pl. Trial Ex. 4.) Lenoci claimed that "[he] wasn't really allowed to speak a whole lot" in civil court and that the judge said that "if [Lenoci] want[ed] to defend [him]self or if [he] want[ed] to say anything, [he had] to hire an attorney[.]" (Tr. at 40:12-16.) According to Lenoci, "[he] was . . . showing up to each court date just to get through it, not

---

[9] Based on the parties' testimony, it appears that criminal charges were also filed against Lopez. (Tr. at 55:24-56:3.) The Court, however, neither heard testimony nor received evidence about the disposition of Lopez's criminal case. (Tr. at 143:3-9.)

[10] It appears that Lopez did not participate in the case because the civil court eventually entered a default judgment against him. (Am. Compl., Ex. A.)

able to defend [him]self." (Tr. at 40:20-22.) "[He] just kind of sat back and watched what was going on." (Tr. at 40:22-23.)

Despite feeling that he could not participate, Lenoci filed both an answer to the complaint and a response to a motion for summary determination filed by Salgado. (Pl. Trial Exs. 5, 7.) For the most part, Lenoci's answer and response contained simple yes or no statements. (*Id.*) However, in response to one of the allegations made in the complaint, Lenoci wrote, "In self-defense, I struck [Salgado's] body." (Pl. Trial Exs. 4, 5, 7.) During the trial held in the adversary proceeding, Lenoci testified that he had made the statement about striking Salgado in self-defense because he did not understand what he was doing and he thought that he had no other option after having pleaded guilty in the criminal case. (Tr. at 41:22-42:1, 54:1-6.)

The civil court eventually held a hearing, and, although it is unclear who was present and what exactly happened, a judgment was entered against Lenoci. (Tr. at 112:24-115:21.) Salgado testified in the adversary proceeding that he did not recall when the state court entered the civil judgment. (Tr. at 113:1-3.) Remarkably, he also did not recall whether Lenoci was even present at the hearing. (Tr. at 115:10-21.) Salgado said, however, that he appeared before a judge and spoke about his injuries, pain, loss of vision, lost wages, and "loss of normal life." (Tr. at 113:4-114:12.) Due to the ambiguous trial testimony and insufficient documentary evidence, the Court is unable to determine whether the civil court held a hearing on the motion for summary determination or the merits of the complaint itself.

In either event, the state court ultimately entered a $500,000 judgment against Lenoci. (Tr. at 114:13-16; Am. Compl., Ex. A.) The judgment order states, in pertinent part:

ORDER

This matter having come before the Court for trial, the Court having jurisdiction, hearing testimony, argument and being fully

advised in the premises:

> IT IS HEREBY ORDERED that Judgment is hereby entered in favor of Plaintiff CHRISTOPHER SALGADO against DAVID LENO [sic] in the amount of $500,000 – and costs.

(Am. Compl., Ex. A.) Salgado made no attempt to collect the debt from Lenoci after the entry of the judgment. (Tr. at 111:2-4.) The state court entered a default judgment against Lopez for the same amount. (Am. Compl., Ex. A.)

### D. The Bankruptcy Case and This Adversary Proceeding

After Lenoci filed a bankruptcy petition, Salgado revived the state court judgment and filed this adversary proceeding. (Tr. at 111:8-24.) An attorney volunteered to represent Lenoci at no cost, and the adversary proceeding went to trial. At the conclusion of the trial, the Court asked the parties to submit briefs addressing the legal standards at issue, and, upon the filing of those briefs, the Court took the matter under advisement. Having reviewed the docket, pleadings and attached exhibits, trial transcript and evidence, and post-trial briefs, the Court is now ready to rule.

### DISCUSSION

In the adversary complaint, Salgado asks the Court to determine that the judgment debt owed to him by Lenoci is not dischargeable under 11 U.S.C. § 523(a)(6) because it is for a willful and malicious injury. Salgado argues that the doctrine of issue preclusion bars Lenoci from disputing that he struck Salgado because Lenoci admitted to doing so in both the criminal and civil cases. Salgado also maintains that, even if issue preclusion does not apply, the testimony and evidence from the trial in the adversary proceeding establish that Lenoci willfully and maliciously injured him. In response, Lenoci argues that he is not precluded from disputing issues raised in the prior cases because they were never actually litigated and he lacked a full and fair opportunity to be heard. Ultimately, Lenoci asks the Court to consider the evidence that he presented in the

adversary proceeding and find that he did not willfully and maliciously injure Salgado.

## A. Issue Preclusion

A party is precluded from disputing an issue that has already been determined by another court.[11] *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979). When one party seeks to bar another from disputing an issue in federal court that was previously determined in state court, the issue preclusion laws of that state apply. *Brokaw v. Weaver*, 305 F.3d 660, 669 (7th Cir. 2002). Salgado argues that Lenoci is precluded from relitigating issues determined by Illinois state courts; thus, the Court must apply the Illinois law of issue preclusion. *See id.* In Illinois, the doctrine of issue preclusion applies when:

> (1) the issue decided in the prior adjudication is identical [to] the one presented in the case under review, (2) the party against whom [issue preclusion] is asserted was a party or in privity with a party to the prior litigation, (3) there has been a final judgment on the merits in the former suit, and (4) the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate the issue in the prior suit.

*Stevenson v. City of Chi.*, 638 F. Supp. 136, 142 (N.D. Ill. 1986). The parties to this proceeding do not dispute that the first three elements of issue preclusion are satisfied. They disagree, however, about the fourth element—that is, whether Lenoci had a full and fair opportunity in the prior cases to contest that he struck Salgado.[12]

Whether a party has had a full and fair opportunity to litigate "depends on whether the party was denied a procedural, substantive[,] or evidentiary opportunity to be heard on the issue."

---

[11] Issue preclusion principles apply in § 523(a) nondischargeability adversary proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991).

[12] Salgado cites two cases to support his argument that Lenoci's prior cases are grounds for applying issue preclusion. *See Coady v. Diaz (In re Diaz)*, 580 B.R. 238 (N.D. Ill. 2017), and *Taradash v. Pokorney (In re Pokorney)*, 143 B.R. 179 (Bankr. N.D. Ill. 1992). The Court acknowledges that issue preclusion may apply in cases like *Diaz* and *Pokorney* that have facts similar to those in the present adversary but finds those two particular cases unpersuasive. Both are distinguishable because the debtors admitted in the adversary proceedings that they had injured the plaintiffs and did not dispute that they had a full and fair opportunity to litigate in the prior adjudications.

*Fried v. Polk Bros., Inc.*, 546 N.E.2d 1160, 1164 (Ill. App. Ct. 1989). Among the reasons that a party may not have had a full and fair opportunity to litigate is the lack of incentive to do so. *Talarico v. Dunlap*, 685 N.E.2d 325, 328 (Ill. 1997). Such incentive might be absent, for example, where a party is concerned primarily about the immediate consequences of litigation or where future litigation is unforeseeable. *See id.* at 330-32 (ruling that a party was not precluded from disputing an issue to which the party already admitted in a criminal guilty plea, where the negotiated plea agreement provided for a reduced sentence).

The application of issue preclusion is "limited to the precise factual or legal issues actually litigated and decided when a prior order was entered." *People v. Williams*, 563 N.E.2d 385, 393 (Ill. 1990). Thus, issue preclusion applies only when a prior judgment was based on findings of specific, material, and controlling facts that were necessary to the prior judgment. *See Case Prestressing Corp. v. Chi. Coll. of Osteopathic Med.*, 455 N.E.2d 811, 815 (Ill. App. Ct. 1983) (collecting cases and holding that a general verdict could not support the application of issue preclusion when the jury considered several issues). The party arguing that issue preclusion applies bears the heavy burden of showing with certainty that the prior judgment already determined the identical and precise issue sought to be precluded. *Anderson v. Fin. Matters, Inc.*, 672 N.E.2d 1261, 1267 (Ill. App. Ct. 1996). The court in a subsequent suit must examine the entire record in the prior case, not just the judgment, and should not apply issue preclusion if the record is "very sparse as to the factual basis for the [prior] court ruling and the nature of that ruling." *FNA Grp., Inc. v. Arvanitis (In re Arvanitis)*, 523 B.R. 633, 641 (Bankr. N.D. Ill. 2015).

Lenoci's uncontroverted testimony about the criminal case demonstrates that there was little incentive for him to litigate. Lenoci signed a statement so that the State would charge him with a misdemeanor instead of a felony because his main concern was to avoid jail time. Signing

the statement allowed him to go home rather than spend the night in jail. After he was charged, Lenoci chose to plead guilty instead of contesting the charges because pleading guilty meant no jail time, while pleading innocent involved the possibility of imprisonment.

Although Lenoci may have had more incentive to litigate in the civil case, both the testimony and the evidence from the trial in the adversary proceeding showed that he was unable to represent himself effectively. Without an attorney to advise him, Lenoci reasonably may have thought that he could not dispute the allegation that he struck Salgado because he had pleaded guilty in the criminal matter. As a result, Lenoci admitted in the civil case to striking Salgado but claimed that he did so in self-defense.

In the end, the civil court entered a judgment against Lenoci, but the record is "very sparse" as to the factual basis and nature of the ruling. *See id.* The judgment order merely states that the matter came before the civil court for trial and that the court heard testimony and argument. The parties' testimony in the adversary, however, casts doubt on how much Lenoci participated in the civil trial and whether he was even present. No evidence was offered in the adversary proceeding about whether the trial in the civil case related to the complaint itself or the summary determination motion.

In addition to Lenoci's lack of opportunity to fully and fairly litigate the prior cases, no evidence shows the specific, material, and controlling facts on which the prior judgments were based. The parties did not provide transcripts of the hearings in the prior cases. Rather, the only documents presented in the adversary proceeding that related to the criminal judgment were the criminal misdemeanor complaint, the certified statement of conviction/disposition, and an acknowledgement signed by Lenoci.

Although those documents establish that Lenoci pleaded guilty to battery in the criminal

case, they contain no specific findings. Likewise, while the civil pleadings, motion for summary determination, and response contain specific allegations and admissions, the skeletal judgment entered by the state court lacks any finding to allow the Court here to determine which issues were litigated and determined.

Based on the foregoing, the Court finds that Lenoci is not precluded from disputing in the adversary proceeding that he struck Salgado. Although several elements of issue preclusion are uncontested, the Court is not convinced that Salgado has carried the heavy burden of proving that Lenoci had a full and fair opportunity to litigate in the prior cases. Salgado has also failed to present evidence, with any degree of specificity, to establish which issues were decided in the prior suits. Accordingly, the Court concludes that issue preclusion does not apply here and now turns to the merits of Salgado's § 523(a)(6) nondischargeability claim.

### B. Exception to Discharge for Willful and Malicious Injury Under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides that any debt "for willful and malicious injury by the debtor to another entity" is not dischargeable. 11 U.S.C. § 523(a)(6). Debts for intentional torts such as assault and battery are generally excepted from discharge under § 523(a)(6). *Green v. Odom (In re Odom)*, Nos. 92 A 0202, 91 B 13598, 1992 WL 350575, at *4 (Bankr. N.D. Ill. Nov. 2, 1992). The burden of proof for nondischargeability actions under § 523(a)(6) is the preponderance of the evidence standard, and it falls on the plaintiff. *See Grogan*, 498 U.S. at 291. In light of one of the principal purposes of the Code—to grant a "fresh start" to the "honest but unfortunate debtor"—"exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). At the same time, another purpose of the Code is to minimize creditors' losses, especially when the debtor has not been honest. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

There are three elements to a § 523(a)(6) claim: "injury, willfulness, and malice[.]" *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013). Although the Code does not define the term "injury," it "is understood to mean a 'violation of another's legal right, for which the law provides a remedy.'" *Id.* (quoting *In re Lymberopoulos*, 453 B.R. 340, 343 (Bankr. N.D. Ill. 2011)). To establish willfulness, proof that the debtor acted with intent to inflict injury or substantial certainty that the act would result in an injury is required. *Id.* A deliberate or intentional act that merely leads to an injury is not enough. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Finally, the element of malice is satisfied when the debtor acts "in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will[.]" *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)). After reviewing the various ways that courts have defined the elements of § 523(a)(6), the Seventh Circuit summarized a willful and malicious injury as "one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolai*, 677 F.3d at 324.

The element central to the Court's decision here is "injury"—that is, whether Lenoci in fact caused the injury to Salgado. Now that Lenoci has finally had his day in court, two very different stories have emerged as to how that injury occurred. Lenoci claims that he did not strike Salgado. He testified at trial that his earlier guilty plea and admission stemmed from his desire to avoid jail time, the inability to afford adequate representation, and a misunderstanding of the law. In contrast, when Salgado and his brother took the stand, they maintained emphatically that Lenoci struck Salgado in the face with a baseball bat, which caused the loss of vision in his right eye.

The Seventh Circuit has "held that the trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony . . . ." *United States v. Woods*, 233 F.3d

482, 484 (7th Cir. 2000) (quoting *United States v. Pitz*, 2 F.3d 723, 727-28 (7th Cir. 1993)). Both Salgado and his brother were highly credible for many reasons. Their stories were consistent, their testimony was detailed and corroborated by other evidence, and their version of the story has remained constant from the very beginning. On the other hand, Lenoci has told three different versions of the story. In the criminal case, he admitted to striking Salgado when he signed the statement and pleaded guilty. In the civil case, he admitted to striking Salgado but claimed that it was in self-defense. In this proceeding, Lenoci now claims that his friend Lopez struck Salgado.

Not only was Lenoci not as credible as the Salgado brothers, but also his trial testimony was inconsistent and uncorroborated. Lenoci himself acknowledged that the witnesses to the fight, including his own mother, all refused to testify on his behalf. Despite being given every chance to convince the Court that he did not strike Salgado, Lenoci has failed to do so. Therefore, having considered the evidence and testimony, and having weighed the credibility of the witnesses, the Court accepts Salgado's version of the story and finds that he has established that Lenoci struck and injured him by a preponderance of the evidence.

As to the remaining elements, Salgado has also established that Lenoci acted both willfully and with malice. Lenoci was the aggressor who pursued and struck Salgado. Lenoci had the baseball bat when the confrontation began. He carried the bat as he followed Salgado into the street. He then used the bat as a weapon to hit Salgado in the face. In the context of a fight, a baseball bat is a formidable weapon that is used to intimidate and sometimes to strike and injure others. In this case, Lenoci used the bat to do both. Thus, the Court finds that Lenoci willfully caused Salgado's injury. As for malice, Lenoci made no attempt in this proceeding to argue that there was just cause or excuse for his actions; instead, he claimed, unconvincingly, that he had not struck Salgado at all. Lenoci struck Salgado with the baseball bat "knowing he had no legal

justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *See Jendusa-Nicolai*, 677 F.3d at 324. As a result, the Court finds that the elements of willfulness and malice are satisfied.

## CONCLUSION

For the foregoing reasons, the Court finds that the debt owed to Salgado by Lenoci is for an injury caused when Lenoci struck Salgado in the face with a baseball bat and that Lenoci's actions were both willful and malicious. All of the elements required under § 523(a)(6) have been established, and accordingly, the debt is not dischargeable under that statutory exception to discharge. A separate order will be entered consistent with this Memorandum Opinion.

DATED: **April 25, 2019**

ENTERED:

Janet S. Baer
U.S. Bankruptcy Judge

In re: Salgado v. Lenoci, II
Case No. 16-ap-00223

## CERTIFICATE OF SERVICE

I, Alex Dragonetti, certify that on April 25, 2019 I caused to be served copies of the foregoing documents to the following by electronic service through the Court's CM/ECF system or regular U.S. mail:

_____
Courtroom Deputy

### Electronic Service through CM/ECF System and Service by U.S. First Class Mail

| | |
|---|---|
| Aaron Davis | Conrad S Szewczyk |
| Jason J DeJonker | Conrad Szewczyk and Associates |
| Bryan Cave Leighton Paisner LLP | 205 W. Randolph St. Suite 850 |
| 161 N. Clark St. Ste. 4300 | Chicago, IL 60606 |
| Chicago, IL 60601 | |